IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AMANDA BERRY and A'CIRE
NEWBY,

      Plaintiffs,

      v.

THE GREAT AMERICAN DREAM
INC., d/b/a PIN UPS,

      Defendant.

CIVIL ACTION FILE NO.

1:13-CV-03297-TWT-GGB

## NON-FINAL REPORT AND RECOMMENDATION

## ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Amanda Berry and A'Cire Newby ("Plaintiffs") worked as dancers at Pin Ups, an adult entertainment nightclub. Plaintiffs seek damages for alleged violations of the minimum wage and overtime wage requirements of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"). Plaintiff Berry also asserts a cause of action for pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k) ("PDA").

This matter is before the Court on the partial motion for summary judgment filed by defendant The Great American Dream, Inc. d/b/a Pin Ups ("Defendant" or

"Pin Ups") on Plaintiff Berry's Count Three claim of sex/pregnancy discrimination under Title VII and the PDA [Doc. 42].  For the reasons stated below, I recommend that Defendant's motion for partial summary judgment be denied.

## I.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant carries its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case."  Celotex v. Catrett, 477 U.S. 317, 325 (1986).

"Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324; Fed. R. Civ. P. 56(c).  "Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment." Bald Mountain Park, Ltd. v. Oliver, 863 F.2d 1560, 1563 (11th Cir. 1989).

2

Federal Rule 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which he will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. <u>Id.</u> at 322-23.

In deciding a motion for summary judgment, the Court must view all evidence and draw any factual inferences in the light most favorable to the nonmoving party. <u>Samples v. City of Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). The requirement to avoid summary judgment is that there be no "*genuine* issue of *material* fact." <u>Id.</u> at 248 (italics in original). Resolving all doubts in favor of the nonmoving party, the Court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." <u>Id.</u> at 252.

A party may move for summary judgment on a part of a claim or defense. Fed. R. Civ. P. 56(a). As the Eleventh Circuit has stated:

AO 72A
(Rev.8/82)

> A[n] ... order granting partial summary judgment from which no immediate appeal lies is merged into the final judgment and reviewable on appeal from that final judgment. ... An order granting [summary] judgment on certain issues is a judgment on those issues. It forecloses further dispute on those issues at the trial stage. An order denying a motion for partial summary judgment, on the other hand, is merely a judge's determination that genuine issues of material fact exist. It is not a judgment, and does not foreclose trial on the issues on which summary judgment was sought.

Lind v. United Parcel Serv., Inc., 254 F.3d 1281, 1284 n.4 (11th Cir. 2001) (citation and italics omitted).

## II. FACTS

In light of the foregoing summary judgment standard, the Court finds the following facts for the purpose of resolving Pin Ups' motion for partial summary judgment on the issue of whether sex appeal is a bona fide occupational qualification ("BFOQ") and a complete defense to liability under Title VII and the PDA on Plaintiff Berry's Count Three pregnancy discrimination claim.

### Pin Ups' Business

Pin Ups is an adult entertainment club that features nude dancers ("entertainers"). [Doc. 42-2, Def.'s Stmt. of Mat. Facts ("DSMF"), ¶¶ 1-2]. Pin Ups' primary focus is featuring female entertainers who take off their clothes and dance for

4

customers.  According to Pin Ups, its entertainers have the most important job in the organization.  [Id. ¶ 2].  Plaintiff Berry worked as an entertainer at Pin Ups under the stage name "Amen" from December 19, 2011 through February 17, 2013.  [Id. ¶¶ 3-5].

There are two stages at Pin Ups, a main stage in the center of the room and a VIP room off to the side.  The entertainers' job duties include dancing on the main stage for three songs per stage dance, dancing on the floor, and dancing in the VIP room at a customer's request.  [Id. ¶ 6].  Generally, the more the customers tip, the more clothing Pin Ups' entertainers remove.  [Doc. 41-9 at 34, Berry Dep. at 28-29].[1] Pin Ups requires that when its DJ calls an entertainer to the stage, the entertainer must dance on the stage for three songs per set (about ten minutes).  If the entertainer does not go on stage when her name is called by the DJ or exits the stage before the next dancer arrives, she is required to pay a fine.  [DSMF ¶¶ 7-9].

Besides entertainers, Pin Ups employs managers, house moms, bartenders, waitresses, cashiers, security staff, and office personnel.  At all relevant times, Kelly Campbell was the general manager overseeing the day-to-day operations of the club, including overseeing the other managers, the kitchen, advertising, banking,

---

[1] All references to deposition page numbers are to the actual page number of the transcript rather than the number reflected in the CM/ECF headings in the electronic versions filed with the Court.

handling the cash money, and ordering liquor and supplies.  [Doc. 42-6, Campbell Dep., at 22-23].  The managers under Campbell were responsible for running the business during the shift(s) they were working, including opening and closing the club, handling situations such as disputes between dancers (or dancers and customers), and maintaining the bar.  [DSMF ¶ 13].  Keith Barkers and Angela Sheffield worked as managers during the time that Berry danced at Pin Ups.  Barkers handled security and scheduling, and Sheffield managed the entertainers and house moms.  House moms are responsible for assisting dancers with their needs, such as helping with makeup and costumes.  "Platinum" and "Vanity" were two of the house moms who worked with Berry.  [Id. ¶¶ 11-13, 15-16].

### Pin Ups' Policies and Procedures

In order to work at Pin Ups, entertainers must agree to abide by the company's policies and procedures.  [Campbell Dep. at 45-46].  When an entertainer starts dancing at Pin Ups, the club provides her with a two-page manual or guideline of its policies, procedures, and rules.  [DSMF ¶ 18].  Berry signed an acknowledgment of her receipt of the entertainers' manual on December 19, 2011.  [Id. ¶ 19; Campbell Dep. at 46-47].

6

In addition to abiding by the policies listed in the entertainers' manual, entertainers are required to pay numerous fees to Pin Ups, such as slow day fees, leave early fees, after-hours shift fees, bar fees, and DJ and house mom fees. [DSMF ¶ 20]. If an entertainer chooses not to work on a slow day during a given week, Pin Ups requires her to pay an extra $20 fee. If an entertainer leaves before her designated shift ends, she must also pay a "leave early fee" of $20. [Id. ¶¶ 20-21, 23]. An entertainer who fails to pay the required fees may be barred from working at the club. [Doc. 41-4, Campbell 30(b)(6) Dep. at 36, 46]. Pin Ups enforces its policies, including its fee policies, through its managers, security staff, and house moms.

### Hiring of Entertainers

Pin Ups does not have any formal recruitment process, nor does it check whether entertainers have past experience in adult dancing before hiring them. Pin Ups does not provide any training or performance evaluations for its entertainers. [Campbell Dep. at 48-49]. Hiring is based largely on "appearance, and there's some weight [given] if they can dance." [Id. at 49].

Barkers testified that the assessment of appearance is based on the subjective opinion of the individual manager, but normally what Pin Ups' hiring managers look for "are bodies that aren't overweight. You know, ... they don't have stretch marks and

flab hanging over or cottage cheese type thighs or excessive bullet wounds or stab

marks and things like that, you know, stuff that would deter from the fantasy of adult

entertainment." [Doc. 42-11, Barkers Dep., at 52]. According to Barkers,

> [W]e don't have standards. We're not hiring girls based on,
> well, we know we need so many of this standard, so many
> of that standard. We come in and if they've danced before,
> they tell them to audition. If they look like they're in
> somewhat of a physical condition, some type of shape, ...
> then we bring them on.
>     There are girls that have been thicker. There are girls
> that are slim. You know, there are different body types that
> we take on, but they are all within a certain standard. We
> wouldn't hire someone 5'2", 300 pounds. We would hire
> someone that is height and weight proportioned.

[Id. at 53]. Nevertheless, Barkers testified that some of the dancers at the club do

"have large bellies," "bellies that overhang over their waist," and the "thicker" dancers

have larger breasts, bigger butts, and wider hips than what he would characterize as

Pin Ups' "slim" dancers. [Id. at 55-56]. Pin Ups permits entertainers of varying body

types to dance at the club to "cater to every [customer] preference." [Sheffield Dep.

at 53-56; Campbell Dep. at 144-45]. Barkers testified, "I don't know what the

customer particularly wants. Everybody has a preference, you know." [Barkers Dep.

at 54]. Some entertainers at the club have been mistaken for being pregnant when they

were not pregnant. [Sheffield Dep. at 56]. Pin Ups has not conducted any studies or

surveys regarding customer preference for dancer body types.  [Barkers Dep. at 66; Sheffield Dep. at 48].  Both plaintiffs were able to work at Pin Ups merely by showing up and showing that they had adult entertainment permits.  [Berry Dep. at 137; Doc. 41-10, Newby Dep. at 15-17].

### *Conduct and Appearance Rules*

Although Pin Ups does not have a weight requirement for its entertainers, Pin Ups does have general rules and requirements on how entertainers must look, dress, and conduct themselves while working in order to ensure that its entertainers present the image and service that Pin Ups sells, including requirements related to showering, shaving, manicures, costumes and heels, and hair and makeup.  [DSMF ¶¶ 24, 30-31; Campbell Dep. at 144-45].  Entertainers are counseled to be fit, rather than fat.  [Campbell Dep. at 145; Barkers Dep. at 50-51].  Angela Sheffield testified that she counseled Plaintiff Berry "a few times about her weight" and to "get back on her cardio" because it had gotten to the point that "she was just out of shape." [Sheffield Dep. at 73].

It is undisputed that an entertainer at Pin Ups may be fired or not permitted to perform if she does not meet Pin Ups' appearance requirements.  [DSMF ¶ 32].  For instance, Berry testified that one of the entertainers working at Pin Ups during her

AO 72A
(Rev.8/82)

tenure there, Kimbella, was not permitted to perform because she did not meet Pin Ups' appearance requirements, but she was later permitted to return to work. [Berry Dep. at 202-04]. In addition to appearance, Pin Ups also has performance and stylistic requirements for its entertainers relating to dancing/performance positions and lewd gestures, customer interactions, and coverage of clothing. [DSMF ¶¶ 30-31].

### Pregnant Entertainers

Pin Ups does not have any formal written or specific policy regarding pregnant entertainers. [DSMF ¶ 36; Doc. 46-2, Pl.'s Stmt. of Add'l Mat. Facts ("PSAMF") ¶ 85]. Barkers testified that he is aware of entertainers who were pregnant and danced at the club. [PSAMF ¶ 85]. For appearance and safety reasons, however, if the club notices or learns that an entertainer is pregnant, Pin Ups may ask the entertainer to leave until they "terminate the pregnancy or ... carry it out." [Campbell Dep. at 141-42]. Berry testified that at "[m]ost clubs and Pin Ups, you would be let go" if you became pregnant as an entertainer. [Berry Dep. at 223; DSMF ¶ 45].

With regard to appearance, Sheffield testified that Pin Ups' informal policy is that once an entertainer is showing, "once you can visibly see that they're pregnant," the entertainer is permitted to dance on the floor (where they can wear an outfit that camouflages the pregnancy), but "they're not allowed to go on stage" where the

lighting makes "a dancer ... look more pregnant." [Sheffield Dep. at 39-43]. Sheffield testified that the dancers normally "take themselves out of the equation" and quit dancing at the club when they become pregnant because of their weight gain, they are "uncomfortable," and "they're not making any money." [Id. at 44]. But if the dancers do not stop performing on stage on their own volition, Sheffield testified that she has instructed at least 20 pregnant dancers, including Berry, to stay off the stage once they were visibly pregnant because "[i]t looks bad," "we're in an appearance industry," and some customers have complained about entertainers who look pregnant. [Id. at 41, 45-48]. For example, Sheffield testified that one customer told her, "[D]ang, Angel, why you got all these pregnant girls in here. Y'all need to slow down on that. It's not a good look." [Id. at 48].

Sheffield testified that each individual's body is unique and has a different appearance so that some are able to meet Pin Ups' standards of sex appeal well into their pregnancies while others may not be able to do so. [Id. at 44, 48-51, 54-56, 61]. According to Sheffield, an entertainer named Sariah worked at the club and performed on the floor up until she was about eight months pregnant. [Id. at 47]. Secret, another entertainer, also danced on the floor of Pin Ups well into her pregnancy. [DSMF ¶ 50]. According to Jackie Ford, a former dancer at Pin Ups who became pregnant, Pin Ups'

11

policy was that entertainers who were pregnant were not permitted to dance at the club at all, either on the floor or on the stage.  [Doc. 46-3, Decl. of Jackie Ford, ¶ 4].

With regard to safety, Pin Ups states that its concern for the safety of pregnant entertainers is based on the potential for injury and harm (and liability to the club) as a result of climbing slippery stairs and poles and dancing on stage in four-inch stilettos around smoke, a fog machine, hot lights, and alcohol.  [Campbell Dep. at 143; Sheffield Dep. at 41-43].

### Berry's Departure from Pin Ups

Berry became pregnant in or around December 2012.  Around a week or two before her last day of work on February 17, 2013, Berry told her house moms Platinum and Vanity that she was pregnant.  [Berry Dep. at 169].  Sheffield testified that about a week prior to February 17, 2013, Sheffield instructed Berry not to dance on the stage anymore because of Berry's appearance.  [Sheffield Dep. at 60, 62].  Berry ignored Sheffield's instruction, however, and danced on the stage anyway.  [Id. at 58].

Berry testified that on February 17, 2013, she was on the floor dancing for a customer when she saw Platinum and Angela Sheffield talking about her.  [Berry Dep. at 173].  Sheffield had seen Berry in the dressing room with her feet propped up and her ankles and feet were swollen.  [Sheffield Dep. at 58-59].  According to Sheffield,

AO 72A
(Rev.8/82)

Berry had gained weight "everywhere," including her arms, she did not look "fit," and her "appearance wasn't up to par." [Sheffield Dep. at 61-62]. When Sheffield asked Platinum why Berry was gaining weight and told her "you know we have a weight requirement," Platinum explained that Berry was pregnant. In response, Sheffield said, "Oh, she is? Tell her this is her last night. We're putting her in the books." [Berry Dep. at 173, 176-77]. When an entertainer's name is "put in the book," that means the entertainer is suspended or fired. [Sheffield Dep. at 60]. Platinum later reported her conversation with Sheffield to Berry, who became upset because she did not believe her pregnancy was showing at all. Berry testified that she did not think she was gaining too much weight, but she "suppose[d]" that Pin Ups viewed her as gaining weight during the first few months of her pregnancy in comparison to Pin Ups' requirements. [DSMF ¶ 61; Berry Dep. at 176-77]. Berry testified that she felt uncomfortable because Sheffield had said it was her last night, and so she decided to leave the club before the end of her shift. [Berry Dep. at 175-78].

When Berry tried to leave the club before her shift ended, she was asked to pay the leave early fee, but she refused to pay it. [Id. at 178, 180, 197-98; Barkers Dep. at 59, 63; Campbell Dep. at 152]. Barkers testified that when Berry tried to leave without paying, there was a commotion and Berry was telling security, "I'm not paying the

F'ing thing.  I'm pregnant anyway.  I'm not coming back with this MFer." [Barkers Dep. at 59].  Barkers testified that Berry was not normally a "trouble person" at the club, so he encouraged her to pay the fee so she could leave in good standing, but she refused and left without paying.  Because Berry did not pay the fee, Barkers told the door girl to put Berry's name in the book (also referred to as the "fired book" or "fired list") for "refus[ing] to pay leave early" fee on February 17, 2013. [Id. at 60; Sheffield Dep. at 70-71].  There is no mention in the book or "fired list" about Berry being pregnant or being terminated because she was pregnant.  [DSMF ¶¶ 68-69; Doc. 42-9 at 1].  Barkers testified that if Berry had come back and paid the leave early fee, he would have taken her name off the list or out of the book, and she would have been allowed to continue dancing at the club.  [Barkers Dep. at 63-64].  Sheffield gave similar testimony. [Sheffield Dep. at 64-67].  The record indicates that Berry had previously been added to the "fired list" on November 22, 2012 for "arguing, provoking fight, disruptive," but she was subsequently allowed to return to work at Pin Ups.  [Doc. 42-9 at 1; DSMF ¶ 71].

Throughout the course of this litigation, Pin Ups has maintained that it never terminated Plaintiff Berry's employment because of her pregnancy; rather, Plaintiff quit. [Doc. 42-1 at 4; Sheffield Dep. at 66].  Angela Sheffield testified that on Berry's

14

last night working at Pin Ups, Berry told Sheffield that that would be Berry's last night because she was tired, she had not made any money in the past few weeks, but she was still having to pay her bar fee. [Sheffield Dep. at 58]. Berry unequivocally disputes, however, that she made those statements to Sheffield. [Doc. 46-2, Pl.'s Resp. to DSMF ¶ 59]. Instead, Berry testified that when she found out Sheffield had said to put Berry's name in the book, Berry became upset because she did not think she was showing at all, and thought that if Platinum had not told Sheffield that Berry was pregnant, Sheffield would not have known. [Berry Dep. at 178]. Because Berry was upset, she decided to leave early. [Id.]. Berry contends that she was in effect fired twice, first on the basis of her pregnancy, and then when she left without paying the leave-early fee. [Id. at 177-82; DSMF ¶¶ 57, 67].

Berry's baby was born on July 18, 2013. [DSMF ¶ 73]. According to Pin Ups, Berry is eligible to return to work there if she pays the $20 leave-early fee from the night of February 17, 2013. [Id. ¶ 70; Sheffield Dep. at 67]. However, at no time after February 17, 2013 has Berry sought to return to work at Pin Ups. Berry's adult entertainer permit expired on December 20, 2013, and she has not obtained a more recent or current permit. [DSMF ¶¶ 72-74; Berry Dep. at 43-44].

### III.  DISCUSSION

As noted above, Plaintiff Berry alleges in Count Three of Plaintiffs' complaint that Pin Ups violated Title VII and the PDA by unlawfully terminating Berry's employment because she was pregnant.  [Doc. 1, Compl., at 9-10, ¶¶ 41-45].

"The PDA provides that the prohibition against sex-based employment discrimination in § 703(a) of Title VII, 42 U.S.C. § 2000e-2(a), applies with equal force to discrimination on the basis of 'pregnancy, childbirth, or related medical conditions.'" Armindo v. Padlocker, Inc., 209 F.3d 1319, 1320 (11th Cir. 2000) (citing 42 U.S.C. § 2000e(k)).  Further, the PDA provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes ... as other persons not so affected but similar in their ability or inability to work." Id.  The analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits.  Id. (citing Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1312-13 (11th Cir. 1994)).

Plaintiff's disparate treatment claim, brought under Title VII and the PDA, requires proof of discriminatory intent.  Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 767-68 (11th Cir. 2005)  Where, as here, the plaintiff does not contend that she has presented direct evidence of discrimination, the court must analyze the claim under

16

the McDonnell Douglas burden-shifting framework, which requires the plaintiff to create an inference of discrimination through her *prima facie* case.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973); Springer v. Convergys Customer Mgmt. Group, Inc., 509 F.3d 1344, 1347 (11th Cir. 2007).   Under McDonnell Douglas, "once the plaintiff has made out the elements of the *prima facie* case, the burden shifts to the employer to articulate a non-discriminatory basis for its employment action." Springer, 509 F.3d at 1347 (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).  If the employer does so, the presumption is eliminated, and the plaintiff is given an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the employer is a pretext for discrimination.  Id.  At all times, the plaintiff retains the ultimate burden of persuading the finder of fact that the defendant acted with discriminatory intent.  Burdine, 450 U.S. at 253.

To establish a *prima facie* case of discriminatory discharge under the McDonnell Douglas framework, Berry must show the following: (1) she is a member of a protected class; (2) she was qualified for the position at issue; (3) she was subjected to an adverse employment action; and (4) some additional evidence that would allow an inference of discrimination.  See id. (requiring that plaintiff show

"circumstances which give rise to an inference of unlawful discrimination"); White v. Verizon South, Inc., 299 F. Supp. 2d 1235, 1240 (M.D. Ala. 2003).

Throughout this litigation, Pin Ups has consistently argued that Plaintiff Berry was an independent contractor, not an employee (subject to the protections of Title VII and the PDA). [Doc. 42-13 at 5, 7]. Nevertheless, for purposes of Pin Ups' motion for partial summary judgment currently before this Court, Pin Ups assumes *arguendo* that Plaintiff Berry can establish a *prima facie* case of pregnancy discrimination under Title VII and the PDA. [Doc. 42-1 at 10].

Here, there is no doubt that Berry has established a *prima facie* case of pregnancy discrimination. Although neither party discussed the elements of a *prima facie* case, Berry has presented sufficient evidence to create an inference that her termination was based on unlawful discrimination. Berry testified that the same night Angela Sheffield learned Berry was pregnant, Berry was told that that was her last night working at Pin Ups and her name would be placed in the book (i.e., she was being terminated). [Berry Dep. at 173-78, 181-82].

Presentation of a *prima facie* case by a plaintiff raises a rebuttable inference of discrimination and shifts the burden of proof to the employer to respond with a legitimate, nondiscriminatory reason for discharging the plaintiff. See Berman v.

Orkin Exterminating Co., Inc., 160 F.3d 697, 701-02 (11th Cir. 1998). Pin Ups has

met its burden by providing as its legitimate, nondiscriminatory reason that Pin Ups

did not discharge or fire Berry because she was pregnant. Instead, she quit.

The burden then shifts back to Berry to raise a genuine factual issue as to

whether that proffered reason is a pretext for discrimination. Raney v. Vinson Guard

Serv., Inc., 120 F.3d 1192, 1196 (11th Cir. 1997). Berry may do so either directly --

through evidence of a discriminatory motive -- or indirectly "by showing that the

employer's explanation is unworthy of credence." Burdine, 450 U.S. at 256; Combs

v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). In meeting her burden

of producing evidence of pretext, Berry may include the previously produced *prima*

*facie* evidence, provided the totality of evidence is "sufficient to permit a reasonable

factfinder to conclude that the reasons given by the employer were not the real reasons

for the adverse employment decision." Combs, 106 F.3d at 1528. If the proffered

reason is one that might have motivated a reasonable employer, the employee "must

meet that reason head on and rebut it, and the employee cannot succeed by simply

quarreling with the wisdom of that reason." Chapman v. AI Transp., 229 F.3d 1012,

1030 (11th Cir. 2000). If a defendant articulates more than one legitimate,

19

nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive summary judgment. Id. at 1037.

Berry has met her burden. In rebuttal to Pin Ups' assertion that Berry voluntarily resigned because she was tired and no longer making money during her pregnancy – and then she was subsequently terminated for failing to pay a "leave early fee" when she left her shift early on February 17, 2013, Berry testified that she did not quit; that was not what happened. Rather, Berry was told her name would be placed in the book that very evening (i.e., she could no longer dance at the club) because she was pregnant. [Berry Dep. at 173-78, 181-82]. Berry testified that she became so upset because she did not understand the decision to put her name in the book that she decided to leave work before her shift ended. [Id. at 178].

Thus, there is a disputed question of fact as to whether Berry voluntarily resigned or, as Berry contends, she was let go on February 17th by the dance manager, Angela Sheffield, on the basis of Berry's pregnancy, and she was then effectively fired a second time when she left without paying Pin Ups' "leave early fee." Because Plaintiff Berry is the non-moving party, this Court must view any disputed fact in her favor. The issue of whether or not an employee quit or was terminated is a question of fact for the jury. See Fetner v. City of Roanoke, 813 F.2d 1183, 1186 (11th Cir.

1987) ("the issue of whether Fetner resigned or was fired is a disputed question of fact, precluding summary judgment."); <u>Labrousse v. Caribbean Airmail, Inc.</u>, No. 09-23529-CIV, 2011 WL 3516029, at *6 (S.D. Fla. Aug. 11, 2011) ("[T]he parties dispute whether Labrousse was fired or quit of her own accord.  Because Labrousse is the non-moving party, this Court must view any disputed fact in her favor.  Accordingly, Defendant's claim that Labrousse voluntarily quit her job cannot serve as a basis for this Court to grant summary judgment.").

### *Pin Ups' Assertion of Bona Fide Occupational Qualification as Defense*

Throughout its briefing papers, Pin Ups repeatedly asserts that even assuming that Berry can establish a *prima facie* case of pregnancy discrimination, sex appeal is a bona fide occupational qualification for employment at Pin Ups that provides a complete defense to Berry's claim that she was unlawfully terminated based on her pregnancy.

Despite the general prohibition against intentional employment discrimination pursuant to Title VII and the PDA, disparate treatment on the basis of sex may be allowed where a particular sex is deemed a qualification reasonably necessary to the functioning of a business (i.e., a "bona fide occupational qualification" ["BFOQ"]). See <u>Ferrill v. Parker Group, Inc.</u>, 168 F.3d 468, 473 (11th Cir. 1999) (citing 42 U.S.C.

AO 72A
(Rev.8/82)

§ 2000e-2(e)(1) (providing that an employer may intentionally discriminate "on the basis of ... religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise....").

In the case of sex (or pregnancy) discrimination, the BFOQ defense is an extremely narrow exception to the general prohibition of discrimination on the basis of sex as a protected characteristic. Id. (citing Dothard v. Rawlinson, 433 U.S. 321, 334, 97 S. Ct. 2720, 2729 (1977); EEOC Guidelines, 29 C.F.R. § 1604.2(a) (stating that "the bona fide occupational qualification exception as to sex should be interpreted narrowly.")); see also Wilson v. Southwest Airlines Co., 517 F. Supp. 292, 298 (N.D. Tex. 1981) ("To date, the [EEOC] has steadfastly adhered to its position that customer preference gives rise to a bona fide occupational qualification for sex in one instance only, '(w)here it is necessary for the purpose of authenticity or genuineness ... e.g., an actor or actress.'") (quoting 29 C.F.R. § 1604.2(a)(2)).

Pin Ups argues that the essence or purpose of its business as an adult entertainment club is to provide sex-oriented dancing entertainment services that project an image and fantasy of female sexuality. [Doc. 42-1 at 10]. Pin Ups contends that by Berry's last day of work on February 17, 2013, her pregnancy had started

22

showing on stage, she had gained significant weight, and her ankles and feet appeared swollen. [Doc. 42-1 at 16]. Pin Ups argues that when a pregnancy results in physical changes, like Berry's, that cause a dancer to fall short of the standards of "non-pregnant sex appeal" sold and promoted by Pin Ups, the dancer no longer meets the minimum qualifications of continued service, and Pin Ups is entitled to terminate the dancer's employment during her pregnancy. [Id. at 14-15]. Pin Ups concedes that its standards of sex appeal may be "somewhat subjective," but argues that its "standards" are supported – at least in part – by some of the feedback it has received from customers stating that pregnant dancers are "not a good look" and that the customers would not return unless Pin Ups remedied its sex appeal image. [Id. at 15].

Both Pin Ups and Berry have spent numerous pages in their submissions discussing BFOQ. Pin Ups' argument regarding BFOQ is without merit for multiple reasons. First, as discussed above, there is a question of fact about the real reason for Plaintiff's termination. Pin Ups contends that Plaintiff resigned and Plaintiff contends that she did not resign. Moreover, there is no such thing as a BFOQ based on sex appeal because sex appeal is not a protected classification.[2] Finally, while there may

---

[2] It appears that the parties may have confused BFOQ with legitimate non-discriminatory reason. Lack of sex appeal could possibly be a legitimate non-discriminatory reason for firing a nude dancer. But as discussed above, Defendants do not contend that lack of sex appeal was the actual reason that they terminated

be some types of employment where not being pregnant is a BFOQ, dancing at Pin Ups is not one of them.  Pin Ups is not arguing that it terminates its dancers (or is entitled to terminate its dancers) because they are pregnant.  In fact, Pin Ups freely admits it has permitted pregnant dancers to work at the club well into the seventh or eighth months of their pregnancies.

In sum, because there is a disputed issue of fact on whether Plaintiff was fired because of her pregnancy, and the BFOQ defense does not apply in this case, Pin Ups' motion for partial summary judgment should be denied.

## IV.  CONCLUSION

For the reasons stated above, and because disputed issues of material fact remain, I **RECOMMEND** that Pin Ups' Motion for Partial Summary Judgment [Doc. 42] be **DENIED**.

**IT IS SO RECOMMENDED**, this 18th day of December, 2014.

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

---

Plaintiff's employment.